UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMARA NAPPIER, as mother and
next fried of T.N., a minor child, on
behalf of T.N. and a class of all
others similarly situated,

        Plaintiff,

                                     Case No.  1:16-CV-636

v.

                                     HON. GORDON J. QUIST

RICHARD SNYDER, et al.,

        Defendants.

_____/

## OPINION REGARDING JURISDICTION

Plaintiff filed this putative class action case in the Michigan Court of Claims on March 23, 2016, against Richard Snyder, Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott (collectively the State Defendants); Stephen Busch, Patrick Cook, Michael Prysby, Liane Shekter Smith, and Bradley Wurfel (collectively the MDEQ Defendants); and Darnell Early and Gerald Ambrose. Plaintiff alleged a single substantive count of gross negligence and/or negligence against all Defendants arising out of the water crisis in Flint, Michigan.

On May 31, 2016, Defendant Busch removed the case to this Court, alleging that removal was proper under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), and, alternatively, under the substantial federal question doctrine arising from 28 U.S.C. § 1441.  On February 17, 2017, the Court entered an order cancelling oral argument on Defendants' motions to dismiss and directing the parties to address the Court's concerns regarding subject matter jurisdiction.  Pursuant to the February 17, 2017, Order, the MDEQ Defendants, Plaintiff, and the State Defendants have filed responses.  Having read the parties' responses, the Court concludes that the MDEQ Defendants

were not "acting under" any federal officer or agency when they took the actions set forth in the complaint, and thus were not entitled to remove this case under the federal-officer removal statute. In addition, the Court concludes that it does not have jurisdiction under the substantial federal question doctrine.[1]  Accordingly, the Court will remand this case to the Michigan Court of Claims.

## I. BACKGROUND[2]

In 2014, as a cost-saving measure, the City of Flint switched its water source from the City of Detroit water system to the Flint River.  (ECF No. 1-3 at PageID.43.)  In connection with the switch, officials discontinued corrosion-control treatments required by the Environmental Protection Agency's (EPA) Lead and Copper Rule (LCR) and added ferric chloride, which increased the corrosivity of the Flint River water, to reduce formation of trihalomethanes from organic matter. (*Id.*)

Plaintiff, the mother and next friend of T.K., a minor, alleges that Defendants knew that the water pumped from the Flint River was toxic and not fit for consumption, but nonetheless assured the public that it was safe to drink.  (*Id.*)  Plaintiff further alleges that, in spite of Defendants' assurances, T.K. experienced an elevated blood lead level and suffered permanent brain damage as a result of drinking water from the Flint River.  (*Id.* at PageID.45.)  Plaintiff alleges that Defendants were grossly negligent and/or negligent in participating in, or facilitating, the switch to Flint River water as the source of the City of Flint's water.  Plaintiff seeks to represent a class of all individuals who were minors, resided in the City of Flint, and suffered brain damage as a result of ingesting water supplied from the Flint River.  (*Id.* at PageID.41.)

---

[1]Although the MDEQ Employee Defendants request oral argument, the Court concludes that oral argument will not assist the Court in deciding the issue, which has been fully briefed by the MDEQ Employee Defendants.

[2]The following facts are taken from the complaint.

2

The MDEQ Defendants are current and former employees of the MDEQ who played a part in the City of Flint's change of water sources.

Defendant Shekter Smith was, until October 19, 2015, the Chief of the Office of Drinking Water and Municipal Assistance for the MDEQ. Plaintiff alleges that Shekter Smith "knowingly participated in, approved of, and caused the decision to transition Flint's water source to a highly corrosive, inadequately studied and treated alternative," and made false statements that led to public consumption of the contaminated water. (*Id.* at PageID.47, ¶ 38.)

Defendant Wyant was, until December 29, 2015, the Director of the MDEQ. Plaintiff alleges that Wyant "participated in, directed, and oversaw the MDEQ's repeated violations of federal water quality laws, the failure to properly study and treat Flint River water, and the MDEQ's program of systemic denial, lies, and attempts to discredit honest outsiders." (*Id.*, ¶ 39.) Plaintiff alleges that Defendant Wyant also made false statements that led to continued public consumption of contaminated water. (*Id.*)

Defendant Busch was and remains the District Supervisor assigned to the Lansing District Office of the MDEQ. Plaintiff alleges that Busch "participated in MDEQ's repeated violation of federal water quality laws, the failure to properly study and treat Flint River water, and the MDEQ's program of systemic denial, lies, and attempts to discredit honest outsiders." (*Id.* at PageID.47–48, ¶ 40.)

Defendant Cook was and remains a Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ. Cook is also the manager of that unit and "participated in[,] approved, and/or assented to the decision to allow Flint's water to be delivered to residents without corrosion control or proper study and/or testing." (*Id.* at PageID.48, ¶ 41.)

3

Defendant Prysby was and remains an Engineer assigned to MDEQ District 11 (Genesee County). Prysby "participated in, approved, and/or assented to the decision to switch to the water source, failed to properly monitor and/or test the Flint River water, and provid[ed] assurances . . . that the Flint River water was safe when he knew or should have known those statements to be untrue." (*Id.*, ¶ 42.)

Defendant Wurfel was, until December 29, 2015, the MDEQ's Director of Communications. Plaintiff alleges that Wurfel was "the MDEQ's principal means of public deception, repeatedly denying the increasingly obvious disaster as it unfolded." (*Id.* at PageID.49, ¶ 43.)

## II. REMOVAL BURDEN

MDEQ Defendant Busch removed the case to this Court pursuant to the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), alleging that pursuant to the federal Safe Water Drinking Act (SDWA), 42 U.S.C. § 300f *et seq.* and the EPA's LCR, the EPA has delegated authority to the MDEQ to act on its behalf and regulate public water drinking systems and that Defendant Busch took the actions alleged by Plaintiff in the course of fulfilling his duties delegated by the EPA to the MDEQ. (ECF No. 1 at PageID.4.) Defendant Busch alleged that he "was standing in the shoes of the EPA and taking actions which EPA would have otherwise been required to take, and his alleged actions were taken pursuant to EPA's oversight and guidance." (*Id.*) Defendant Busch also alleged that this Court has jurisdiction under 28 U.S.C. § 1441 because "Plaintiffs' [sic] claims are inextricably intertwined with the construction, interpretation, and effect of the SDWA and the LCR." (*Id.* at PageID.10.) The remaining MDEQ Defendants join in Busch's notice of removal.

As the removing parties, the MDEQ Defendants have the burden of establishing this Court's jurisdiction. *Jerome-Duncan, Inc. v. Auto-By-Tel, LLC*, 176 F.3d 904, 907 (6th Cir. 1999). Any

doubts regarding "the propriety of removal are resolved in favor of remand."[3]  *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 405 (6th Cir. 2007) (quoting *Jacada, Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 704 (6th Cir. 2005) (internal quotation marks omitted)).

### III.  DISCUSSION

**A.      Removal Under § 28 U.S.C. § 1442(a)(1)**

The federal-officer removal statute provides as follows:

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

The purpose of the statute is to protect federal officers from being subjected to legal proceedings in hostile state courts based on the enforcement of federal laws "by providing these federal officials with an unbiased federal forum."  *Brown & Williamson Tobacco Corp. v. Wigand*, 913 F. Supp. 530, 533–34 (W.D. Ky. 1996); *see also N. Colo. Water Conservancy Dist. v. Bd. of Cnty. Comm'rs of the Cnty. of Grand*, 482 F. Supp. 1115, 1117 (D. Colo. 1980) ("The purpose of 28 U.S.C. § 1442(a)(1) is to protect federal officers from state interference with the exercise of

---

[3]Suggesting that the answer to the instant jurisdictional question is obvious, the MDEQ Defendants state that "[i]t is telling that Plaintiffs [sic] did not object to removal, given the authority that MDEQ Defendants presented." (ECF no. 72 at PageID.6815.)  But Plaintiff's failure to object does not relieve this Court of its obligation to examine its jurisdiction in this case.  *See Kusens v. Pascal Co.*, 448 F.3d 349, 359 (6th Cir. 2006) ("It is well-established that the federal courts are under an independent obligation to examine their own jurisdiction.").  Moreover, in her response, Plaintiff states that "she is not in a position to opine regarding the MDEQ Defendants' factual basis for removal." (ECF No. 73 at PageID.7387.)  Thus, the Court infers nothing from Plaintiff's failure to object.

federal authority."). As the Supreme Court has explained, the history of the federal-officer removal statute is rooted in customs and revenue statutes that met with fierce opposition from the States. *Willingham v. Morgan*, 395 U.S. 402, 405, 89 S. Ct. 1813, 1815 (1969). The *Willingham* Court noted that the first such removal provision was included in an 1815 customs statute aimed at "enforc[ing] an embargo on trade with England over the opposition of the New Englant [sic] States, where the War of 1812 was quite unpopular." *Id.* The removal provision prevented States from interfering with enforcement of the customs statute by allowing federal officers to remove to federal court any civil or criminal proceeding against them based on "any act done 'under colour' of the statute." *Id.* Similar removal provisions were included in Civil War-era revenue laws, and Congress subsequently extended the protection to all federal officers when it enacted the current provision in 1948. *Id.* at 405–06, 89 S. Ct. at 1815.

It is true, as the MDEQ Defendants note, that the Supreme Court has observed that "[t]he federal officer removal statute is not 'narrow' or 'limited[,]' . . . [and] [a]t the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 406–07, 89 S. Ct. at 1816 (citation omitted). But, *Willingham* cited *Colorado v. Symes*, 286 U.S. 510, 52 S. Ct. 635 (1932), for the quoted proposition, which, the Sixth Circuit has observed, considered a narrower removal statute that "protected only those 'acting under or by authority of' federal officers who were themselves 'acting by authority of any revenue law of the United States." *Ohio State Chiropractic Ass'n v. Humana Health Plan, Inc.*, 647 F. App'x 619, 622 (6th Cir. 2016). The Sixth Circuit further observed in *Humana* that "each of the broad interpretations that Humana emphasizes traces to earlier versions of § 1442 that granted the removal power only to individuals enforcing federal customs and revenue laws." *Id.* (citing, among others, *Arizona v. Manypenny*, 451 U.S. 232, 101 S. Ct. 1657 (1981), and *Willingham*). Thus, the

court reasoned, "proper context" showed that the liberal construction recognized in *Symes* was of limited use in determining whether a private health insurance contractor was entitled to remove under § 1442(a)(1).  *Id.*[4]

Removing parties, such as the MDEQ Defendants, who are not federal officers must satisfy a three-part test to establish proper removal under § 1442(a)(1).  *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010).  First, the removing party must show that "it is a 'person' within the meaning of the statute who 'act[ed] under [a federal] officer.'" *Id.* (quoting § 1442(a)(1)).  Second, the party "must demonstrate that it performed the actions for which it is being sued 'under color of [federal] office[.]'" *Id.* (quoting § 1442(a)(1)).  Finally, the party must "raise[] a colorable federal defense."  *Id.*  (citing *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431, 119 S. Ct. 2069 (1999)).

The Supreme Court's decision in *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 127 S. Ct. 2301 (2007), provides the most useful guide in determining the circumstances under which a non-federal officer will be deemed to satisfy the "acting under" a federal officer requirement.  In *Watson*, the plaintiffs sued the defendants, cigarette manufacturers, alleging that the defendants violated state laws prohibiting unfair and deceptive business practices by advertising certain cigarette brands as "light," when, in fact, the manufacturers manipulated testing results by designing cigarettes and using techniques that caused the cigarettes to have lower levels of tar and nicotine than the cigarettes actually sold to customers.  *Id.* at 146, 127 S. Ct. at 2304.  The defendants invoked the federal-officer removal statute to remove, and both the district court and the

---

[4]Some courts have recognized a distinction in the application of the removal statute depending on the status of the removing party.  Those courts note that while "federal officer jurisdiction is read expansively in suits involving federal officials, it is read narrowly where . . . only the liability of a private company purportedly acting at the direction of a federal officer is at issue."  *Mills v. Martin & Bayley, Inc.*, No. 05-888-GPM, 2007 WL 2789431, at *5 (S.D. Ill. Sept. 21, 2007) (internal quotation marks omitted).

Eighth Circuit concluded that removal was proper because the plaintiffs' complaint attacked the defendants' use of the federal government's method of testing cigarettes. *Id.* The Court held that removal was improper because the federal government's heavy regulation of the defendants' product testing did not satisfy the statute's "acting under" requirement. *Id.* at 152–53, 127 S. Ct. at 2308.

*Watson* emphasized several important principles that bear on whether a private person acted under a federal officer. First, the "acting under" relationship "typically involves subjection, guidance, or control," *id.* at 151, 127 S. Ct. at 2307, and "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152, 127 S. Ct. at 2307. Mere compliance with the law does not constitute "help or assistance necessary to bring a private person within the scope of the statute." *Id.* Second, the fact that a company (or a State) is subject to, and complies with, a federal order does not ordinarily create the type of state-court "prejudice" at which the removal statute is directed. *Id.* Finally, the fact that an entity is "highly regulated . . . even if the regulation is highly detailed and even if the [entity's] activities are highly supervised and monitored," will not provide a basis for removal under § 1442(a)(1). *Id.* at 153, 127 S. Ct. at 2308.

The MDEQ Defendants offer essentially three bases to support their contention that they were acting at the direction, and with the authorization, of the EPA, such that they should be deemed to have "acted under" the EPA. First, the MDEQ Defendants note that after Flint's water source was switched to the Flint River and water quality issues arose, the EPA directed the MDEQ's response and ultimately issued an Emergency Administrative Order addressing the steps the MDEQ and the City of Flint were required to take to protect the public health. Second, the MDEQ Defendants argue that Plaintiff's allegations regarding their involvement in the process of switching the source of Flint's water system to the Flint River necessarily implicate the MDEQ Defendants' administration, application, and enforcement of the federal LCR, demonstrating that the MDEQ

Defendants acted on behalf of the EPA and not simply as an instrumentality of the State. Finally, they argue that, although their administration and enforcement of the federal LCR was accomplished through the Michigan Safe Drinking Water Act, they acted at the direction, and on behalf of, the EPA, and thus are actually being sued for actions that the EPA would have taken in the absence of the EPA's formal delegation of authority to the MDEQ.

While this Court believes that *Mays, et al v. City of Flint, et al.*, No. 16-11519 (E.D. Mich. Oct. 6, 2016), correctly concluded that the MDEQ Defendants are not entitled to remove under § 1442(a)(1), the analysis, in this Court's judgment, begins and ends with the State of Michigan's (and by extension the MDEQ's) independent role as enforcer of Michigan law and the SDWA.

Congress enacted the SDWA in 1974 'to ensure that public water supply systems meet minimum national standards for the protection of public health." *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 768 (D.C. Cir. 1992). The SDWA provides that the EPA's drinking water regulations "shall apply to each public water system in each State." 42 U.S.C. § 300g. The SDWA also recognizes that the States may play an important part in administering and enforcing drinking water standards. *See Nat. Res. Def. Council v. EPA*, 806 F. Supp. 275, 277 (D.D.C. 1992) (noting that "it is clear from the plain language of the Safe Drinking Water Act that the states play a critical and independent role of implementation"). In fact, a State may obtain "primary enforcement responsibility for public water systems" if the EPA determines that the State meets certain requirements. 42 U.S.C. § 300g-2. To obtain such authority, a State must: (1) adopt its own "drinking water regulations that are no less stringent than the . . . [EPA's] regulations,"; (2) adopt and implement adequate procedures to enforce such regulations; and (3) keep records and make reports required by the EPA. 42 U.S.C. § 300g-2(a). *See also* 40 C.F.R. § 142.10 (setting forth the requirements for determination of primary enforcement responsibility). Thus, while the SDWA "is

9

administered by the EPA[,] . . . [it] establishes a joint federal-state system for assuring compliance with national standards." *Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 401 (4th Cir. 2006); *see also United States v. Cnty. of Westchester*, No. 13-cv-5475 (NSR), 2014 WL 1759798, at *4 (S.D.N.Y. Apr. 28, 2014) (stating that the SDWA "authorized the EPA to establish Federal standards that would be applicable to all public water systems and to establish a joint Federal–State system for assuring compliance with these standards and for protecting underground sources of drinking water"); *Nat. Res. Def. Council*, 806 F. Supp. at 277–78 (concluding that the members of a Governors' Forum on Environmental Management were not mere advisors to the EPA because, under the SDWA, governors "act operationally as independent chief executives in partnership with the federal agency," and a contrary conclusion "would ignore the responsibilities the states maintain in complying with the [SDWA]").

As the MDEQ Defendants concede, the Michigan legislature passed its own Safe Drinking Water Act in 1976, *see* M.C.L.A. § 325.1001, *et seq.*, and the MDEQ's predecessor assumed primary enforcement responsibility to administer and enforce the SDWA in 1978. (ECF No. 72-2.) And, pursuant to Michigan's Safe Drinking Water Act, the MDEQ has "power and control over public water supplies and suppliers of water." M.C.L.A. § 325.1003.

In light of the SDWA's "joint federal-state system" that, as here, assigns primary enforcement responsibility to the States, the MDEQ Defendants were not "acting under" the EPA at all, in the sense of assisting or helping the EPA to perform its duties or tasks. *See Watson*, 551 U.S. at 2307. Rather, it is clear that at all times, the MDEQ Defendants were acting for and on behalf of the MDEQ to fulfill its own duties under the Michigan Safe Drinking Water Act. *Cf. N. Colo. Water Conservancy Dist.*, 482 F. Supp. at 1118 (concluding that the removing parties were "not acting as federal entities or as agents of the [EPA]" pursuant to the Clean Water Act, but

instead were acting as political subdivisions of Colorado). Such remains true notwithstanding that the MDEQ Defendants consulted and interacted extensively with the EPA when water quality issues arose after the switch to the Flint River. After all, consultation and interaction are consistent with any joint undertaking. Thus, if anything, this is not a case of the MDEQ assisting the EPA to perform its duties, but of EPA personnel assisting the MDEQ in performing its duties.

The EPA's Emergency Administrative Order issued on January 21, 2016, does not alter the analysis. The order itself confirms that, rather than acting for the EPA, the MDEQ was "an instrumentality of the State." (ECF No. 1-7 at PageID.93.) Moreover, even if the order directed MDEQ to follow or apply the LCR or other regulations in a particular manner, *Watson* says that compliance with federal law does not constitute the type of "help or assistance" required under § 1442(a)(1), and compliance with a regulatory order is unlikely to "create a significant risk of state-court 'prejudice.'" 551 U.S. at 152, 127 S. Ct. at 2307.

Accordingly, the MDEQ Defendants have not shown that removal is proper under § 1442(a)(1).

**B.      Removal Under 28 U.S.C. § 1441**

The MDEQ Defendants' also argue that removal was proper because Plaintiff's state-law gross negligence/negligence claim raises a substantial federal question, namely construction and interpretation of the SDWA and the LCR. (ECF No. 1 at PageID.10.) The substantial federal question doctrine applies "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9, 103 S. Ct. 2841, 2846 (1983). However, "[t]he mere presence of a federal issue in a state law cause of action does not automatically confer federal question jurisdiction, either originally or on removal." *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 565 (6th Cir. 2007) (en banc).

11

Application of the doctrine requires that: "(1) the state-law claim must necessarily raise a disputed federal issue; (2) the federal interest in the issue must be substantial; and (3) the exercise of jurisdiction must not disturb any congressionally approved balance of federal and state judicial responsibilities." *Id.* (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314, 125 S. Ct. 2363, 2368 (2005)).  The Supreme Court has emphasized that the substantial federal question doctrine is limited to "a 'special and small category' of cases." *Gunn v. Minton*, __ U.S. __ 133 S. Ct. 1059, 1064–65 (2013) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701, 126 S. Ct. 2121, 2137 (2006)).

In *Grable & Sons Metal Products v. Darue Engineering & Manufacturing*, 545 U.S. 308, 125 S. Ct. 2363 (2005), the plaintiff filed a quiet title action in Michigan state court, alleging that the defendant's title to certain property was invalid.  545 U.S. at 311, 125 S. Ct. at 2366.  Pursuant to  a Michigan court rule, the Plaintiff specifically alleged that its title was superior to the defendant's title because the Internal Revenue Service failed to give adequate notice, as required by a federal statute.  *Id.* at 314–15, 125 S. Ct. at 2368.   The Court concluded that the Defendant properly removed the case based on federal question jurisdiction because whether the plaintiff "was given notice within the meaning of the federal statute [was] . . . an essential element of its quiet title claim, and the meaning of the federal statute [was] actually in dispute." *Id.* at 315, 125 S. Ct. at 2368.  In fact, the Court observed, because the proper interpretation of the federal statute was "the only legal or factual issue contested in the case," its meaning was "an important issue of federal law that sensibly belongs in a federal court." *Id.*

In contrast to *Grable*, the MDEQ Defendants have not shown that Plaintiff's state-law negligence-based claims implicate an important federal interest.  As the Court wrote in *Gunn*:

12

it is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim necessarily raises a disputed issue, as *Grable* separately requires.   The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole.

133 S. Ct. at 1066 (internal quotation marks and bracket omitted).  In short, the state-law claim at issue in this case is a "garden-variety" state-law tort claim that does not raise a federal question at the level of importance of that raised in *Grable*.  *See Mikulski*, 501 F.3d at 571; *see also Mays*, slip op. at 13.

## IV.  CONCLUSION

For the foregoing reasons, the Court will remand this case to the Michigan Court of claims for lack of jurisdiction.

An Order consistent with this Opinion will enter.


Dated:  March 31, 2017                              /s/ Gordon J. Quist
                                                  GORDON J. QUIST
                                            UNITED STATES DISTRICT JUDGE

13